UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

|  |  |  |
|---|---|---|
| Pandora Select Partners, LP, Pandora Select Advisors, LP, Whitebox Convertible Arbitrage Partners, LP, Whitebox Convertible Arbitrage Advisors, LLC, Whitebox Hedged High Yield Partners, LP, Whitebox Hedged High Yield Advisors, LP, Aviator Master Fund, Ltd., Aviator Overseas Fund II, Ltd., Aviator Fund Management, L.P., JMG Triton Offshore Fund, Ltd., JMG Capital Partners, LP, | : : : : : : : : : : : : | Index No.06 CV 0938 (KMW) ECF Case |

Plaintiffs, : **AMENDED COMPLAINT**

v. : **JURY TRIAL DEMANDED**

Strategy International Insurance Group,
Inc., Strategy Real Estate Investments Ltd.,
Stephen Stonhill, Sandro Sordi and John Hamilton, :

Defendants. :

---------------------------------------------------------------x



RECEIVED
APR 2 5 2006
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs Pandora Select Partners, LP, Pandora Select Advisors, LP, Whitebox Convertible Arbitrage Partners, LP, Whitebox Convertible Arbitrage Advisors, LLC, Whitebox Hedged High Yield Partners, LP, Whitebox Hedged High Yield Advisors, LP, Aviator Master Fund, Ltd., Aviator Overseas Fund II, Ltd., Aviator Fund Management, L.P., JMG Triton Offshore Fund, Ltd., JMG Capital Partners, LP, by their attorneys Anthony Ostlund & Baer, P.A. and Morgenstern Jacobs & Blue, LLC, for their Complaint against defendants Strategy International Insurance Group, Inc., Strategy Real Estate Investments Ltd., Stephen Stonhill, Sandro Sordi, and John Hamilton, allege:

## PRELIMINARY STATEMENT

1.      This is a case in which the defendants, using a web of misrepresentations, omissions and false promises, induced the plaintiffs into investing $50,000,000. The investments were in Series A and Series B preferred shares of defendant Strategy Real Estate Investments, Ltd. ("SREI") and in warrants to buy common shares of defendant Strategy International Insurance Group, Inc. ("SIIG"), a publicly-held Texas corporation. Among other things, the defendants represented and warranted that the financial statements of SIIG that had been filed with the Securities and Exchange Commission fairly presented in all material respects the financial position of SIIG and its consolidated subsidiaries. In fact, however, the financial statements were materially misstated because nearly all of the equity recorded on SIIG's balance sheet was based upon promises by its owners to contribute capital, as opposed to actual capital invested. The promises to contribute capital were purportedly secured by mortgages. In fact, however, the mortgages had been released, and the purported capital was nothing more than subscriptions not properly recorded as equity, but rather as a contra account, a material difference that caused SIIG's auditors to issue a "going concern" audit opinion. That means that there is substantial doubt about the ability of SIIG to continue as a going concern.

2.      In addition, defendants failed to disclose material negative facts about some of the defendants' principal executives and directors. Among other things, defendants failed to disclose that Sandro Sordi was found liable in a Florida Court for fraudulent inducement, conversion of funds and violation of Florida's Securities Law and that *punitive damages* as well as compensatory were awarded against him by that jury based upon those allegations. Defendants further failed to disclose that Kevin Hamilton had filed for bankruptcy in 2003.

3.      Defendant SIIG has already failed to register the common shares underlying the warrants purchased by the plaintiffs as promised, and has failed to pay to plaintiffs liquidated damages in an amount in excess of $5,000,000 for failing to register those shares as promised.

4.      Defendants projected timelines for the development of the properties had no basis in fact.  Defendant SREI has made little progress towards the development of the properties despite projections that projects would be completed as soon as May, 2005.

5.      Although defendants have represented that approximately $32 million of the plaintiffs' investment remains in cash on hand as of December 2005, defendants have denied plaintiffs' requests for meaningful information and input about the use of plaintiffs' investment funds and despite promises to the contrary, have refused to allow plaintiffs access to the defendants' accounting personnel or auditors.

## THE PARTIES

6.      Plaintiff Pandora Select Partners, LP, is a British Virgin Islands Limited Partnership with its principal place of business in Minneapolis, Minnesota.  Pandora Select Partners, LP is the record owner of some of the investments at issue in this case.  Pandora Select Partners, LP invested $1 million in defendants.

7.      Pandora Select Advisors, LP, is a Delaware Limited Partnership with its principal place of business in Minneapolis, Minnesota.  Pandora Select Advisors, LP is the investment advisor to Pandora Select Partners, LP and on its behalf made the decision to make the investment in the defendants at issue in this case.

8.      Plaintiff Whitebox Convertible Arbitrage Partners, LP, is a British Virgin Islands Limited Partnership with its principal place of business in Minneapolis, Minnesota. Whitebox

Convertible Arbitrage Partners, LP is the record owner of the investments at issue in this case. Whitebox Convertible Arbitrage Partners, LP invested $5 million in defendants.

9.     Whitebox Convertible Arbitrage Advisors, LLC is a Delaware Limited Liability Company with its principal place of business in Minneapolis, Minnesota. Whitebox Convertible Arbitrage Advisors, LLC is the investment advisor to Whitebox Convertible Arbitrage Partners, LP and on its behalf made the decision to make the investment in the defendants at issue in this case.

10.     Plaintiff Whitebox Hedged High Yield Partners, LP, is a British Virgin Islands Limited Partnership with its principal place of business in Minneapolis, Minnesota. Whitebox Hedged High Yield Partners, LP is the record owner of some of the investments at issue in this case. Whitebox Hedged High Yield Partners, LP invested $4 million in defendants.

11.     Whitebox Hedged High Yield Advisors, LP is a Delaware Limited Partnership with its principal place of business in Minneapolis, Minnesota. Whitebox Hedged High Yield Advisors, LP is the investment advisor to Whitebox Hedged High Yield Partners, LP and made the decision to make the investment in the defendants at issue in this case. The plaintiffs identified in paragraphs 6 through 11 collectively are referred to herein as the "Whitebox Plaintiffs".

12.     Plaintiff Aviator Master Fund, Ltd., is a Cayman Islands corporation. Aviator Master Fund, Ltd. holds $14.5 million in defendants' securities. Some of those securities originally were purchased by Aviator Overseas Fund II, Ltd., a Cayman Islands corporation, and subsequently were transferred to Aviator Master Fund, Ltd. The investment advisor to Aviator Master Fund, Ltd. and Aviator Overseas Fund II, Ltd is Aviator Fund Management, L.P. a

Delaware partnership with its principal place of business in Connecticut. The plaintiffs identified in this paragraph collectively are referred to herein as the "Aviator Plaintiffs".

13.    Plaintiff JMG Triton Offshore Fund, Ltd., is a British Virgin Island corporation. JMG Triton Offshore Fund, Ltd is the record owner of some of the investments at issue in this case. JMG Triton Offshore Fund, Ltd invested $12.25 million in defendants.

14.    Plaintiff JMG Capital Partners, LP, is a California Limited Partnership with its principal place of business in Los Angeles, California. JMG Capital Partners, LP is the record owner of some of the investments at issue in this case. JMG Capital Partners, LP invested $12.5 million in defendants. The plaintiffs identified in paragraphs 13 and 14 collectively are referred to herein as the "JMG Plaintiffs."

15.    Defendant SIIG is incorporated under the laws of Texas. SIIG is a publicly traded holding company for a group of financial service companies that are located throughout the world. Strategy Holding Company Limited is SIIG's wholly-owned subsidiary that sits at the top of a group of insurance related organizations that include Strategy Insurance Limited of Barbados, Strategy Insurance (Canada) Limited, Strategy Underwriting Agency Limited, and SIIG's equity interest in ForestRe Holdings Ltd., ForestRe Ltd. and AgroForest Risk Management Ltd. (collectively, "ForestRe"). Strategy Holding Company Limited owns all of the insurance operations of which the key operating insurance company is Strategy Insurance Limited. Strategy Insurance Limited was incorporated in Barbados on December 23, 2003 under the Exempt Insurance Act and is an operating insurance company.

16.    Defendant SREI is incorporated under the laws of the Province of Ontario, Canada. SREI is a wholly-owned subsidiary of SIIG, and was organized for the purpose of

making investments in the development of residential real estate properties in Canada. SREI was incorporated on August 23, 2004.

17.    Defendant Stephen Stonhill is Chief Executive Officer and Chairman of the Board of SIIG. On information and belief Mr. Stonhill is a resident of Canada.

18.    Defendant Sandro Sordi is General Counsel, Vice President and a Director of SREI. On information and belief Mr. Sordi is a resident of Canada.

19.    Defendant John Hamilton is CEO and a Director of SREI. On information and belief Mr. Hamilton is a resident of Canada. The defendants identified in paragraphs 17 through 19 collectively are referred to herein as the "Individual Defendants."

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1332(a) based upon complete diversity among the plaintiffs and defendants and based upon the amount in controversy which exceeds the sum of $75,000.

21.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa. Claims asserted herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. Under 28 U.S.C. § 1367, the Court also has supplemental jurisdiction over plaintiffs' claims arising under state law.

22.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §§1391(a) and 1391(d) because defendants have expressly consented to venue in this District in operative documents which state that: "Any controversy, claim or dispute arising out of or relating to [the Subscription Agreement] between the parties hereto, their assignees, their affiliates, their attorneys or agents, shall be litigated solely in state or federal court in New York City. Each

party (i) submits to the jurisdiction of any such court, [and] (ii) waives the defense of an inconvenient forum . . ." Further, certain defendants are aliens.

23.    In connection with the acts, transactions and conduct alleged herein, defendants directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of a national securities exchange.

## SUBSTANTIVE ALLEGATIONS

24.    In November 2004, SREI sought to raise money through a private offering pursuant to a Confidential Private Placement Memorandum (the "PPM"). The PPM represented that SREI was seeking US $50,000,000 and stated that the funds would be used to invest, through placements of short-term second mortgages, in certain special purpose resident real estate properties in Canada being developed by the Lux Group Inc., a company formed under the laws of the Province of Ontario, Canada *and under common control with SREI*. McMahan Securities Co. L.P. ("McMahan Securities") was engaged to assist in the offering as a Placement Agent.

25.    On November 16, 2004, plaintiffs purchased the entire private offering of SREI in the aggregate amount of $50,000,000 of Units, each Unit consisting of: (a) one share of Series A Insured Redeemable Preferred Stock of SREI; (b) one share of Series B Preferred Stock of SREI; and (c) a Warrant to purchase shares of common stock of SIIG. The purchase price was $10,000 per unit.

26.    The liquidation preference and the quarterly dividends for the Series A Preferred shares were purportedly insured by United Insurance Company Limited, a Barbados insurer; the Series A Preferred shares being subject to a mandatory redemption in 2007, and fixed preferred cash dividends at the rate of 10% per annum on liquidation preference.

27.     Warrants covering 29,992,202 shares of SIIG's common stock were sold as part of the sale of the Units. Each Warrant allows its holder to exercise the Warrant into a number of shares of common stock equal to the quotient obtained by dividing (a) the liquidation preference amount of the shares of Series A Preferred Stock of SREI owned by such holder plus any accrued but unpaid dividends thereon by (b) the then applicable set price. The initial set price was $1.6671.

28.     Plaintiffs purchased the Units pursuant to a Subscription Agreement with SREI and SIIG, dated November 16, 2004. By the terms of the Subscription Agreement both SREI and SIIG made a series of representations and warranties to plaintiffs to induce their investment in SREI and SIIG. Plaintiffs relied upon these representations and warranties in purchasing the Units and thereby invested in SREI and SIIG.

29.     SREI represented and warranted, among other things, that neither the Subscription Agreement nor any other documents, certificates or instruments furnished to the plaintiffs by or on behalf of SREI in connection with the transactions contemplated by the Subscription Agreement contained any untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made therein, not misleading.

30.     SIIG represented and warranted, among other things, that the reports and exhibits it had filed with the Securities and Exchange Commission ("SEC") for the two years preceding the date of the Subscription Agreement (collectively referred to as the "SEC Reports") complied in all material respects with the requirements of the Securities Act and the Exchange Act and the rules and regulations of the SEC promulgated thereunder, and that none of the SEC Reports, when filed, contained any untrue statements of a material fact or omitted to state a material fact

necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

31.     SIIG further represented and warranted that the financial statements of SIIG included in the SEC Reports were prepared in accordance with the United States generally accepted accounting principles applied on a consistent basis during the periods involved ("GAAP"), and that such financial statements fairly presented in all material respects the financial position of SIIG and its consolidated subsidiaries.

32.     SIIG further represented and warranted that since the date of the latest audited financial statements included within the SEC Reports there has been no event, occurrence or development that has had or that could reasonably be expected to result in a material adverse effect.

33.     SIIG further represented and warranted that all disclosures provided to plaintiffs regarding SIIG, its business and the transactions contemplated hereby furnished by SIIG are true and correct and do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.

34.     The SEC Reports and financial statements of SIIG that plaintiffs reviewed and relied upon in connection with their November 2004 purchase of the Units included a description of a February 2004 transaction by SIIG's wholly-owned subsidiary Strategy Holding Company Limited ("Strategy Holding").

35.     In early February 2004, as part of its initial capitalization, the PPM represented that Strategy Holding received, as consideration for the issuance of 40% of the shares of its Series A Preferred Stock and Series B Preferred Stock, mortgage notes receivable totaling

$104,231,610. The notes were purportedly secured by certain mortgages on Canadian real estate reportedly having an estimated fair market value (confirmed at the time by a valuation conducted by a real estate broker) equal to the carrying amount of the mortgage notes.

36.     The mortgages were registered on February 5, 2004 in the name of Garadan Inc. ("Garadan") and Maintop Holdings Inc. ("Maintop"), companies wholly-owned by Kavrav Ltd. Garadan and Maintop assigned the mortgages to Strategy Holding on February 5, 2004, and on the same day Strategy Holding reassigned the mortgages to SIL, another one of SIIG's subsidiaries.

37.     In its Form 10-KSB for the annual period ending April 30, 2005 (the "2004-2005 Annual Report"), filed on September 16, 2005, SIIG reported that on or about August 12, 2005, SIIG became aware that the mortgages underlying the notes receivable had been discharged in October 2004 by the beneficial owners of SIIG's Series A Preferred Stock and Series B Preferred Stock, as well as the corporate entities controlled by them, including Kavrav Ltd.

38.     Kavrav Ltd is one of the founders of SIIG.  Kavrav Ltd and Frank Ney own approximately 71.3% of SIIG's common stock and are able to determine the composition of SIIG's board of directors.  Although SIIG represented in at least one SEC filing that it intended to pursue all of its legal rights and remedies including, without limitation, litigation to recover the value of the notes receivable and appropriate damages against Kavrav, Ltd and others, upon information and belief no such action has been taken.

39.     John Hamilton, the Chief Executive Officer of SREI, has voting power of the shares owned by Kavrav, Ltd pursuant to a voting agreement with Kavrav, Ltd.  Sordi likewise has voting power of the shares owned by Frank Ney pursuant to a voting agreement.

40.     As a result of the discharge of the mortgages, the notes became unsecured. As such, generally accepted accounting principles required that the notes receivable be reflected as contra-equity rather than as assets on SIIG's financial statements.

41.     SIIG reported the discharge of the mortgages in the audited financial statements included in its 2004-2005 Annual Report, and reclassified the notes receivable as subscriptions. Therefore, the unsecured notes receivable should have been and now are reflected in SIIG's audited financial statements as a contra-equity account.

42.     In its 2004-2005 Annual Report, SIIG further disclosed that its auditors have issued a "going concern" qualification as part of their opinion in the audit. This means that there was substantial doubt about the ability of SIIG to continue as a "going concern."

43.     Because the mortgages were discharged in **October 2004**, prior to the date of the PPM provided to plaintiffs by SIIG and SREI and prior to plaintiffs' purchase of the Units, the representations and warranties contained in the November 16, 2004 Subscription Agreement concerning SIIG's financial statements, balance sheets, and SEC Reports were false and materially misleading when made as SIIG and SREI failed to disclose, in any manner, the discharge of the mortgages and the materially adverse financial consequences to SIIG and SREI resulting from the discharge.

44.     The PPM and the defendants further failed to disclose material facts about certain principal executives. Among other things, the PPM failed to disclose that Sandro Sordi, the General Counsel, Vice President and a Director of SREI ("Sordi"), and John Hamilton, the Chief Executive Officer and a Director of SREI had been named defendants in a $20 million lawsuit by Maple Palm Production, Inc. which alleged "scandalous" conduct, including fraudulent and negligent misrepresentations.

45.     The PPM and the defendants further failed to disclose that since February 4, 2003, Sordi has not been eligible to practice law in the State of Florida; indeed, the PPM states that he continues to maintain a small private legal practice.

46.     The PPM and the defendants further failed to disclose that on April 24, 1996, a contract indebtedness suit had been brought against Sordi and another individual in Broward County, Florida.   On February 28, 2002, a jury verdict was rendered in favor of McDowell against Sordi and the other individual in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida.  The jury found that there were damages for fraudulent inducement by Sordi and the other individual and conversion of funds.  The jury also found that there had been a violation of Florida's Securities Law, Chapter 517.  The jury also found that the circumstances warranted punitive damages against Sordi; it was adjudged that McDowell recover $611,000 from Sordi and the other individual, jointly and severally, and that he further recover  $100,000 in punitive damages against Sordi.  The order was entered at Fort Lauderdale, Broward County, Florida on March 5, 2002.

47.     The PPM and the defendants further represented that Lux Group Inc. ("Lux"), the primary real estate developer for the projects in which SREI was investing, was managed by an experienced management team including as its Chief Executive Officer, Kevin Hamilton, the brother of John Hamilton (Chief Executive Officer and Director of SREI).    The PPM described Kevin Hamilton in glowing terms, and represented that he "had a wealth of business insight, financial management and industry experience."  The defendants failed, however, to disclose a 2003 bankruptcy filing in Canada by Mr. Hamilton.  He reported his total liabilities at the time as CND$936,000; he did not report his total assets.

48.     John Hamilton and Sordi directly and indirectly beneficially own approximately 32% of Lux.

49.     The PPM and the defendants further misrepresented the true status of the development process for the Canadian real estate and/or made projections which had no basis in fact. In the PPM, defendants represented that:

50.     Construction of the 11 Christie Street property began in September 2004, and completion of construction was expected in May, 2005. As of December 19, 2005, the scheduled completion of the property was 15 months later; August, 2006. As of December, 2005, the only visible signs of progress at the site are the existence of concrete footings.

51.     Completion of construction on 40 Westmoreland (Toronto, Canada) was planned for October, 2005.   As of December 19, 2005, the site plan had not yet been approved and construction drawings were only 85% complete. As of December 19, 2005, construction had not yet started, but was anticipated to start only in February 2006.

52.     Construction for each of the projects was anticipated to be 14-16 months, with the exception of Elevator Bay, which would take approximately 36 – 42 months.

53.     The PPM's projections relating to the development timeline were without basis in fact.

54.     The defendants acted with scienter.   Among other things, they knew that the financial statements of SIIG were materially misstated, and that rather than the robust equity reported to the SEC, defendant SIIG had a significant negative equity, and that there were substantial doubts as to whether SIIG could continue as a going concern. In addition, defendants knew about the negative history related to Sandro Sordi as alleged above, knew that such negative history was material, that plaintiffs would not have invested $50,000,000 in defendants

if they knew of those material misstatements and omissions, and failed to disclose that negative history with the intention that plaintiffs would act without knowledge of Sordi's history.

55.     Plaintiffs invested $50,000,000 on the basis of and in reliance upon the above-referenced representations and without knowledge of the omitted material facts.

56.     Plaintiffs have been damaged in an amount in excess of $50,000,000.

57.     In connection with plaintiffs' purchase of the Units, plaintiffs and SIIG also entered into a Registration Rights Agreement, dated November 16, 2004.

58.     SIIG is obligated, pursuant to the Registration Rights Agreement, to register for resale the shares of common stock issuable upon exercise of the Warrants purchased by the plaintiffs.

59.     Under the Registration Rights Agreement, plaintiffs are entitled to liquidated damages if SIIG fails to file a Registration Statement and it is not declared effective by the SEC within an allotted period of time.

60.     Because no Registration Statement has been declared effective within the time period set forth in the Registration Rights Agreement, SIIG owes plaintiffs liquidated damages pursuant the Registration Rights Agreement.

61.     SIIG's system of disclosure controls and procedures, at least as of September, 2005, was not effective because of a lack of inadequate numbers of internal personnel possessing the appropriate knowledge, experience and training in applying generally accepted accounting principals and in SEC reporting requirements. Upon information and belief, that ineffectiveness has not been adequately remedied, and there is significant risk that the assets of SIIG and its subsidiaries are being or could be misappropriated or wasted, especially in light of the facts alleged herein.

62.     The Individual Defendants, through their managerial authority, ownership interests in SIIG and affiliates doing business with SIIG and SREI, through their knowledge of misinformation and omissions contained in the PPM, were controlling persons of SREI and SIIG.

**FIRST CAUSE OF ACTION:**

**FOR BREACH OF CONTRACT/WARRANTY – SUBSCRIPTION AGREEMENT**

63.     Paragraphs 1 to 62 of the Complaint are incorporated as if stated fully herein.

64.     In the Subscription Agreement, SIIG and SREI made a series of representations and warranties, as more fully described above, concerning the financial statements, balance sheets, SEC Reports, and other financial information and documents provided to the plaintiffs in connection with plaintiffs' purchase of the Units.

65.     SIIG and SREI breached their representations and warranties set forth in the Subscription Agreement and described above.  The representations and warranties contained in the Subscription Agreement were false and materially misleading when made as SIIG and SREI failed to disclose, in any manner, the discharge of the mortgages and the materially adverse financial consequences to SIIG and SREI resulting from the discharge.

66.     As a direct and proximate result of SIIG's and SREI's breach of warranties and representations, plaintiffs have suffered damages greater than $50,000,000, the exact amount to be proven at trial.

**SECOND CAUSE OF ACTION:**

**FOR BREACH OF CONTRACT – REGISTRATION RIGHTS AGREEMENT**

67.     Paragraphs 1 to 66 of the Complaint are incorporated as if stated fully herein.

68.     Plaintiffs and SIIG also entered into a contract, the Registration Rights Agreement, in connection with plaintiffs' purchase of the Units.

69.     SIIG has breached the Registration Rights Agreement because it has failed to file a Registration Statement to register for resale the shares of common stock issuable upon exercise of the Warrants purchased by the plaintiffs which has been declared effective by the SEC within the period of time set forth in the Registration Rights Agreement.

70.     As a direct and proximate result of SIIG's breach of the Registration Rights Agreement, SIIG owes plaintiffs liquidated damages pursuant the Registration Rights Agreement in an amount greater than $1 million, the exact amount to be proven at trial.

## THIRD CAUSE OF ACTION:

### FOR FRAUD

71.     Paragraphs 1 to 66 of the Complaint are incorporated as if stated fully herein.

72.     The representations made by SIIG and SREI, as described above, concerned material existing facts.

73.     SIIG and SREI made the representations knowing they were false, or with a reckless disregard of the truth or falsity of the representations.

74.     Plaintiffs were unaware that the representations made by SIIG and SREI were not true.

75.     SIIG and SREI made the representations to plaintiffs with the intention that plaintiffs rely upon the representations.

76.     Plaintiffs relied and acted upon the representations made by SIIG and SREI when plaintiffs purchased the Units.

77.     As a direct and proximate result of SIIG's and SREI's fraudulent representations, plaintiffs have suffered damages greater than $50 million, the exact amount to be proven at trial.

110150.2                                    16

## FOURTH CAUSE OF ACTION:
## (BY THE WHITEBOX PLAINTIFFS ONLY)

### FOR MINNESOTA SECURITIES FRAUD
### MINN. STAT. §§ 80A.01 AND 80A.23

78.     Paragraphs 1 to 66 and 71 to 77 of the Complaint are incorporated as if stated fully herein.

79.     As more fully described herein, defendants, in connection with the sale of securities, employed devices, schemes or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices or a course of business which operated as a fraud and deceit upon the Whitebox Plaintiffs as purchasers of securities, all in violation of Minn. Stat. §§ 80A.01 and 80A.23, subd. 2.

80.     Defendants directed their offer to sell securities, including the preferred shares of SREI and the warrants of SIIG, to Minnesota and their offer was received by the Whitebox Plaintiffs in Minnesota.

81.     The Whitebox Plaintiffs justifiably relied on the above-stated misrepresentations and acted without knowledge of the above-stated omissions.

82.     As a direct and proximate result of the aforesaid misconduct, the Whitebox Plaintiffs sustained damages in excess of $1 million in connection with the purchase of the securities, including the preferred shares of SREI and the warrants of SIIG, and are therefore entitled to recover damages from defendants, or alternatively, rescind the transaction and receive all capital previously contributed, together with interest, reasonable attorneys' fees and further relief.

83.     The Whitebox Plaintiffs are also entitled to all relief described in paragraph 81 against the Individual Defendants who have controlling person liability pursuant to Minn. Stat. §80A.23 subd. 3.

### FIFTH CAUSE OF ACTION:
### (BY THE JMG PLAINTIFFS ONLY)

### FOR CALIFORNIA SECURITIES FRAUD
### CAL. CORP. CODE §§ 24501, 25501

84.     Paragraphs 1 to 66 and 71 to 77 of the Complaint are incorporated as if stated fully herein.

85.     As more fully described above, defendants, offered to sell and sold securities, including the preferred shares of SREI and the warrants of SIIG, in California to the JMG Plaintiffs by means of written or oral communications which included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

86.     The JMG Plaintiffs did not know that statements of material fact made defendants were untrue or that the material facts omitted by defendants made defendants' other statements misleading.

87.     Defendants' conduct as described in this Complaint is in violation of section 25401 of the California Corporation Code.

88.     As a direct and proximate result of the aforesaid misconduct, the JMG Plaintiffs sustained damages in excess of $1 million in connection with the purchase of the securities, including the preferred shares of SREI and the warrants of SIIG, and are therefore entitled to recover damages from defendants, or alternatively, rescind the transaction and receive all capital previously contributed, together with interest, reasonable attorneys' fees and further relief.

89.     The JMG Plaintiffs are also entitled to all relief described in paragraph 94 against the Individual Defendants who have controlling person liability pursuant to Cal. Corp. Code. §25504.

### SIXTH CAUSE OF ACTION:

### FOR TEXAS SECURITIES FRAUD
### TEXAS CIV. ST. ART. 581-33

90.     Paragraphs 1 to 66 and 71 to 77 of the Complaint are incorporated as if stated fully herein.

91.     Defendants originated the sales of securities, including the preferred shares of SREI and the warrants of SIIG, to plaintiffs from the State of Texas.

92.     As more fully described above, defendants, offered to sell and sold securities, including the preferred shares of SREI and the warrants of SIIG, to plaintiffs by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

93.     Defendants violated Texas Civ. St. Art. 581-33 with respect to the sales of securities, including the preferred shares of SREI and the warrants of SIIG, to plaintiffs.

94.     As a direct and proximate result of the aforesaid misconduct, plaintiffs sustained damages in excess of $50 million in connection with the purchase of the securities, including the preferred shares of SREI and the warrants of SIIG, and are therefore entitled to recover damages from defendants, or alternatively, rescind the transaction and receive all capital previously contributed, together with interest, reasonable attorneys' fees and further relief.

110150.2

95.     Plaintiffs are also entitled to all relief described in paragraph 100 against the Individual Defendants who have controlling person liability pursuant to Tex. Civ. St. Art. 581-33F.

### SEVENTH CAUSE OF ACTION:

### FOR VIOLATION OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER

96.     Paragraphs 1 to 95 of the Complaint are incorporated as if stated fully herein.

97.     As more fully described herein, defendants, in connection with the sale of securities, including the preferred shares of SREI and the warrants of SIIG, employed devices, schemes or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices or a course of business which operated as a fraud and deceit upon the plaintiffs as purchasers of securities, all in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)-5 promulgated thereunder.

98.     Defendants knew and intended that investors, such as plaintiffs, would rely upon defendants' misrepresentations and omissions in making investment decisions and purchasing securities.

99.     In purchasing their preferred shares of SREI and warrants of SIIG, plaintiffs justifiably relied on the above-stated misrepresentations and acted without knowledge of the above-stated omissions.

100.    As a direct and proximate result of the aforesaid misconduct, plaintiffs sustained damages in excess of $50 million in connection with the purchase of the securities, including the

preferred shares of SREI and the warrants of SIIG, and are therefore entitled to recover damages from defendants.

101.   By virtue of the foregoing, defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)-5 promulgated thereunder and are liable to plaintiffs for the damages they have suffered.

## DEMAND FOR JURY TRIAL

102.   Plaintiffs hereby demand a trial by jury as to all issues so triable.

WHEREFORE, plaintiffs request an Order and Judgment from the Court as follows:

103.   Awarding damages greater than $50,000,000 in favor of plaintiffs, the precise amount to be proven at trial, and against defendants, jointly and severally.

104.   Appointing a Receiver with authority to oversee and direct the financial affairs of SIIG, SREI and their related entities.

105.   Awarding plaintiffs interest, costs and reasonable attorneys fees; and

106.   Granting such further and other relief, including specifically equitable relief, as the Court deems equitable.

Dated: April 25, 2006

MORGENSTERN JACOBS & BLUE, LLC

By: _Rachel K. Marcoccia_

Gregory A. Blue (GB-9569)
Rachel K. Marcoccia (RM-4823)
885 Third Avenue
New York, NY 10022
Tel: (212) 750-6776
Fax: (212) 750-3128

ANTHONY, OSTLUND & BAER, P.A.
Jeffrey I. Ross
Vincent D. Louwagie
Jonathan F. Mack (JM-0439)
90 S. 7th St., Ste. 3600
Minneapolis, MN 55402
Telephone: (612) 349-6969
Facsimile: (612) 349-6996

ATTORNEYS FOR PLAINTIFFS

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 25, 2006, I caused a true and correct copy of Plaintiffs' Amended Complaint to be served via First Class Mail upon:

Charles Cummings, Esq.
Baker & McKenzie LLP
1114 Avenue of the Americas
New York, NY 10036
212-891-3534
212-310-1634 (fax)
charles.b.cummings@bakernet.com

*Attorneys for Defendants*

Rachel K. Marcoccia